ZENITH RADIO CORPORATION et al., Plaintiffs-Appellants, v. THE VILLAGE OF MOUNT PROSPECT, Defendant-Appellee.

(No. 58441;

First District (5th Division)—October 19, 1973.

Leonard Bosgraf, of Chicago, for appellants.

Ross, Hardies, O'Keefe, Babcock & Parsons, of Chicago, and John J. Zimmerman, of Mount Prospect, (R. Marlin Smith and Clifford L. Weaver, of counsel,) for appellee.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

Plaintiff appeal from a judgment dismissing their complaint, to-wit: "[T]hat the plaintiff has failed to show by clear and convincing evidence that the R-1 Single Family Residential classification of the zoning ordinance of the Village of Mt. Prospect is invalid and unreasonable in its application to the property * * * ."

The action was commenced by Zenith Radio Corporation (Zenith), owner of record, and Dominion Development Company (Dominion), contract vendee, seeking judgment declaring the zoning ordinance of the Village of Mt. Prospect classifying plaintiffs' property R-1 (Single Family Residence District) unconstitutional and invalid in its application to said property. Specifically, plaintiffs' claim the ordinance is in violation of sections 2 and 5 of article I of the Illinois Constitution and the fourteenth amendment of the United States Constitution, in that it deprived them of property without due process of law and without just compensation. Further, plaintiffs desired the right to develop the property according to a B-3 classification (Service Business District). The complaint was filed after the denial of an application to the Village of Mt. Prospect to rezone and reclassify said property.

Zenith is the owner of a parcel of land conveyed to it in 1924 and 1925 and located in Mt. Prospect. In 1926, and consistent with the conveyance, Zenith erected two radio towers (156 feet high), and began using them for radio broadcasting, laboratory experiments in radionics, radio receivers and transmitters. In 1945, Zenith erected large electric signs on the towers which read "Zenith" and "Radio", vertically and horizontally, respectively. These signs are 75 feet high, and are illuminated at night. In 1947, the Illinois Supreme Court in *Federal Electric Co. v. Zoning Board of Appeals of the Village of Mt. Prospect,* 398 Ill. 142, 75 N.E.2d 359, upheld Zenith's nonconforming use of the property (which in 1944 had been zoned R-1), and further determined that the erection of the electric signs did not constitute an illegal extension of the nonconforming use.

In April, 1971, Zenith entered into a contract with Dominion to sell the subject property for $56,000, subject to B-3 rezoning. Dominion, in turn, entered into a contract with White Hen Pantry Division of the Jewel Companies, to sell the property, subject to rezoning, for $78,000; the

property to be used as a neighborhood convenience center. The White Hen Pantry retail food store planned to remove the fixtures on the property and, along with other retail service tenants, was to be part of the convenience center. The proposed development was to be 9,700 square feet, with the White Hen Pantry Store to occupy approximately 3,000 square feet. The convenience center would have parking for 29 cars and, additionally, would have a 22 foot high identification sign, internally illuminated. Furthermore, White Hen proposed to erect a stockade type wooden fence on the west and south property lines of the subject property, removing the existing and abundant foliage on the property. White Hen would be open daily from 7:00 A.M. to 11:00 P.M.

The subject property, located on the southwest corner of Central and Mt. Prospect Roads, consists of a parcel of land (0.80 acre) approximately 200 feet by 193 feet and improved, in addition to the aforementioned towers, by a frame residence and garage. Central Road is a four lane road with some traffic control and channelization at the intersection of Central Road and Rand Road (approximately 75 yards east of the subject property). Mt. Prospect Road does not extend to Rand Road; rather, it stops at Central Road where there is a mountable median on the roadway.

. To the east of the subject property, fronting on Mt. Prospect Road, is a Red Balloon Restaurant, Ladendorf's Oldsmobile dealership and a commercial car wash (zoned C-2, Service Business District, by the City of Des Plaines). To the south of these establishments the area is zoned for single-family residences.

To the north of the subject property, on the corner of Central and Rand Road, is a Shell Oil gasoline station. Adjacent thereto, fronting on Rand Road and backing on Central Road, are a Fish and Chips Restaurant; a tile and floor covering store; a Thom McAn shoe store and a Big Boy Restaurant (zoned B-3, Service Business District and P-1, Parking District). Albert Street separates these businesses from multiple and single-family residences on the southeast side of Albert Street.

On the northeast side of Rand and Central Roads is the Mt. Prospect Shopping Center, containing a variety of retail and service operations (zoned B-1, Community Business District). East of the shopping center there are single-family residences and vacant lots. Continuing southeast on Rand Road and south of Central Road (approximately one block east of the subject property) there is a Cheker gasoline station; a Burger King Restaurant (zoned C-2, Service Business District, by the City of Des Plaines); a church and parcels of vacant land interspersed among single-family residences.

The property immediately south and west of the subject property is

comprised of single-family residences, and is a constituent part of a larger scheme of single-family residences continuing west on Central Road and south on Mt. Prospect Road.

Both parties introduced expert witnesses to support their conflicting positions, Neil King, realtor, appraiser and real estate counsellor, testified for plaintiff that the subject property takes its character from the commercial and business uses at the intersection of Rand, Mt. Prospect and Central Roads; that the subject property is unsuitable for single-family residences due to the commercial nature of the area and its attendant noise and light; that the highest and best use of the subject property would be commercial, viz.: normal retail and retail service uses and occupations; that the proposed development would have no detrimental effect on the neighborhood. Further, King testified that the value of the property was $15,000-$16,000, zoned as R-1, and $80,000-$85,000 if zoned B-3. On cross-examination, King conceded that single-family residences could be built on the property, although he questioned whether more than two dwellings could be built.

William Lawrence, a city planning and zoning consultant, testified for plaintiff that, in his opinion, the highest and best use of the subject property would be limited retail and personal services uses, and that the proposed convenience center would be compatible with surrounding uses; that the factors considered in reaching this opinion were: the nature of the highly traveled intersections, the removal of Zenith's existing signs and towers, and the beneficial effect the proposed use would have on the surrounding properties. On cross-examination, Lawrence acknowledged that the subject property was suitable, though not proper, for single-family residences.

Gerald Lindgren, a transportation engineer, testified for defendant regarding a site generation study, a traffic count study and a direction of approach analysis conducted by him at the request of defendant. Lindgren asserted that the number of vehicular trips on adjacent streets generated by the proposed use at peak hours would be 205 movements, and that the impact the proposed use would have on vehicular movements and traffic safety would be to increase the amount of congestion currently in existence.

Thomas Murphy, a city planner, testified for defendant in regard to Mt. Prospect's comprehensive municipal plan, noting its efficacy as a management tool and guide to future development. Further, he testified to the suitability of the subject property for the development of single-family residences, delineating as factors used in reaching his opinion: the general nature of the subject property; the similarity of areas along Central and Mt. Prospect Roads where new residential development has

taken place; the well landscaped nature of the subject property; sound residential property surrounding the subject parcel and the availability of water and sewer facilities. Conversely, he found the property unsuitable for commercial use, citing: its placement in an existing residential community; its operation for long hours; additional traffic problems; additional light and debris; and the environmental effect that the existing high ground coverage might create by a run-off problem. From a planning standpoint, Murphy also raised the question of the need of another convenience center in the area. Murphy concluded that the highest and best use of the subject property would be for single-family use.

James Foley, a real estate appraiser and consultant testifying for defendant, concurred with Murphy as to the suitability of the subject property for single-family residences. Furthermore, he stated the property could be developed with three lots, contrary to the two lot development suggested by plaintiffs' expert, King, each valued between $5,000 and $7,500, with a total value of between $15,000 and $21,000. Finally, Foley determined that the rental value of the right to use the subject property for the advertising signs is approximately $3,600 annually, and the aggregate value from 1950 to 1972 is approximately $40,000-$45,000. On cross-examination, Foley acknowledged that the surrounding commercial properties and the traffic flow all had a depreciatory effect on the subject property for single-family residence purposes.

OPINION

The gravamen of the appeal by plaintiffs is that the Village of Mt. Prospect, by its zoning ordinance, restricted the use of Zenith's property to single-family residences, thereby preventing its use for a neighborhood convenience center. Defendant, however, more clearly frames the issue to be whether the trial court's finding that plaintiffs failed to produce sufficient evidence to overcome the presumptive validity of the Village zoning classification was against the manifest weight of the evidence.

■■ It has repeatedly been held that a presumption exists in favor of the validity of an existing zoning ordinance, and to overcome this presumption the plaintiffs must establish by clear and convincing evidence that, as applied to their property, the ordinance is arbitrary and unreasonable and without substantial relation to the public health, safety, comfort, morals or general welfare. (*Bennett v. City of Chicago*, 24 Ill.2d 270, 273, 274, 181 N.E.2d 96; *Urann v. Village of Hinsdale*, 30 Ill.2d 170, 195 N.E.2d 643; *Kellett v. County of Du Page*, 89 Ill.App.2d 437, 231 N.E.2d 706.) Such proof must establish not merely that the property *could* reasonably be classified as plaintiffs' wish, nor indeed that the court *would* classify it otherwise; rather, the plaintiffs must establish that the legislative decision as to the property is "clearly unreasonable."

(*Menolascino v. Village of Franklin Park*, 106 Ill.App.2d 472, 475, 246 N.E.2d 122, *Jans v. City of Evanston*, 52 Ill.App.2d 61, 201 N.E.2d 663.) Plaintiffs contend they have overcome this presumption and have established the unreasonableness of the challenged ordinance.

■■ Plaintiffs aver that the commercial use now on the subject property must be considered in any determination of the validity of the challenged ordinance. In support thereof, they point out the uniqueness of the situation, *viz.*: the subject property being neither vacant nor currently devoted to single-family residence purposes. To buttress their contention, plaintiffs argue "the effect of the existing ordinance in its application to the existing property, therefore, is not to restore the property to single-family use, but to continue *perpetually* the present commercial use thereon." In so arguing they seek a conclusion of this court that (1) no single-family residence can or will be built on the property or (2) there being one "commercial" use on the property, *a fortiori* another commercial use should be allowed. We cannot so conclude: first, Zenith, at any time, could choose to abandon the existing nonconforming use and convert the subject property into single-family residences. Secondly, Illinois courts have not been constrained to find that surrounding nonconforming uses are determinative factors in deciding the validity of a challenged ordinance; so too the nonconforming use of the subject property itself should not be determinative. In *Lindgren v. City of Chicago*, 124 Ill.App.2d 289, 299, 260 N.E.2d 271, it was stated:

> "The fact that non-permissive uses are carried on by others contrary to the ordinance neither fortifies nor weakens the case of appellants, but each alleged violation of the ordinance is a complete case within itself and must stand or fall upon the facts and circumstances of that case alone.
>
>         *   *   *
>
> In our opinion neither the several legal non-conforming uses nor the illegal conversion should be used as a wedge by plaintiff for declaring defendant's present R-2 zoning ordinance arbitrary and void."

■■ The factors that the court will consider in passing on the validity of a zoning ordinance have been oft repeated.[1] While no single factor is

---

[1] "(1) the existing uses and zoning of nearby property; (2) the reduction in property value resulting from a particular zoning restriction; (3) the extent to which the destruction of property values of the site promotes the general health, safety and welfare of the public; (4) the relative gain to the public as compared with the hardship imposed upon the individual property owner; (5) the suitability of the property for the zoned purposes; (6) the length of time the property has been vacant, as zoned, considered in the context of land development in the area where the property is located." *La Salle National Bk. v. Village of Harwood Heights*, 2 Ill.App.3d 1040, 1045, 278 N.E.2d 114.

determinative of the issue, and the decision in each case must depend on the sum total of the particular facts of that case (*First National Bank and Trust Co. of Evanston v. County of Cook*, 15 Ill.2d 26, 153 N.E.2d 545), we will, therefore, analyze the salient features of each particular point as argued by the parties.

Both parties have gone to great lengths to provide cases which support their position; not a difficult task in light of the proliferation of zoning cases appearing before the courts. Nevertheless, we are required to sift through the conflicting testimony of the parties' experts and determine whether the facts *herein* are supportive of the trial court's holding. The evidence establishes that to the south and west of the subject property, of which the subject property is an integral part, the character of the area is residential. Thomas Murphy testified:

> "[I]mmediately west of the subject property there is [*sic*] some single family residences, this area extends for about half a mile to the immediate west, the same single family area continues in a triangle area between Central Road, Mt. Prospect (Road) and Northwest Highway which is about a half a mile to the south and to the west, runs diagonally in that area for about a half mile triangle, are basically single family uses."

■■ Plaintiffs contend that the R-1 zoning classification on the subject property is not in conformity with existing uses in the area, and argue that defendant's witness admits the subject property is influenced by the neighboring commercial developments. However, all property at or near commercial property is "influenced" by it, yet that fact is insufficient in itself to warrant a reclassification. Some commercial use near or even adjoining the property, does not alter the otherwise residential character of this property. (*Kellett v. County of Du Page, supra.*) The proximity of the subject property to a commercial zone does not render the limitation placed on the subject property unreasonable or invalid. (*Wesemann v. Village of LaGrange Park*, 407 Ill. 81, 89, 94 N.E.2d 904; *DeBartolo v. Village of Oak Park*, 396 Ill. 404, 71 N.E.2d 693; *cert. denied* 332 U.S. 765, 68 S.Ct. 72, 92 L.Ed. 350; *Menolascino, supra.*) Furthermore, the fact that the subject property borders on highly traveled streets has not, in the past, deterred courts from upholding the validity of a single-family residence scheme. (*Cosmopolitan National Bank of Chicago v. Village of Mt. Prospect*, 22 Ill.2d 463, 177 N.E.2d 365; *Elmhurst National Bank v. City of Chicago*, 22 Ill.2d 396, 176 N.E.2d 771.) It is true that the subject property is situated on a busy intersection (although away from the Rand and Central Roads confluence); however, the high volume of traffic does not of itself impart a commercial charac-

ter to the subject property. *Liberty National Bank of Chicago v. City of Chicago,* 10 Ill.2d 137, 139 N.E.2d 235; *Seith v. City of Wheaton,* 89 Ill. App.2d 446, 232 N.E.2d 173.

In the case cited by plaintiff for support, *Chicago Title & Trust Co. v. Village of Wilmette,* 27 Ill.2d 116, 125, 188 N.E.2d 33, the "lots composing it (the questioned property there) were fragmented by condemnation for Skokie Highway," the subject property, here, has no such characteristic. Moreover, as indicated in the exhibits, the subject property is bordered by a heavy cover of foliage which acts to screen the property from the surrounding elements and serves also to maintain the residential nature of the property itself.

■■ We note that there are residences on both Mt. Prospect and Central Roads and, the mere fact that the subject property is on the apex of a residential development, should not dictate its being zoned commercial. Plaintiffs argue that because the property across the street has been given a different classification and has been developed in a different manner demonstrates that the ordinance is unreasonable as applied to the subject property. This court, however, has frequently recognized that a street may form an appropriate boundary of zoning districts and that property on one side of a thoroughfare may be given one zoning classification, while property on the other side may be classified differently. (*Cosmopolitan National Bank, supra.*) Moreover, as stated in *Mid-West Emery Freight System Inc. v. City of Chicago,* 120 Ill.App.2d 425, 439, 440, 257 N.E.2d 127:

> " '[T]he mere presence of buildings or areas being put to use to which the person attacking the validity of a zoning ordinance seeks to put his property, is a wholly insufficient circumstance to show that the ordinance was invalid or discriminatory as to the property of the one assailing the ordinance. * * * Appellant's contention that it is unreasonable to allow a commercial classification to a neighbor, and deny the same classification to their property, would lead to a conclusion that an entire residential area could be progressively rezoned until the whole area was commercialized.' "

Although we may not necessarily conclude that the ultimate result of rezoning is as the court in *Mid-West Emery* portends, we believe that the maintenance of residential integrity, pursuant to a comprehensive plan, should be afforded recognition. The fixing of boundary lines, unless arbitrary or capricious, is a matter of legislative judgment, which courts will respect. Necessarily, residential property immediately abutting the line will be less valuable than property more remote from the boundary

of a commercial zone (*DeBartolo, supra*). But that affords no justification for the constant erosion of such boundaries, *Bolger v. Village of Mt. Prospect*, 10 Ill.2d 596, 603, 141 N.E.2d 22.

■■ Zenith next argues there is a reduction in their property value as a result of the Village's ordinance. We believe that the figures utilized by Zenith, including those in the testimony of its expert, King, to show the resultant diminution in the value of its property, are not entirely reflective of the actual loss to be sustained. The contract Zenith has with Dominion is for $56,000, consequently, any loss occasioned is to be measured from that figure, not the $80,000-$85,000 claimed. Dominion, accordingly, cannot be heard to complain since they have no possessory interest in the subject property. (*Clark Oil & Refining Corp. v. City of Evanston*, 23 Ill.2d 48, 177 N.E.2d 191.) The fact that the subject property may be more valuable if a more intensive use were permitted is universally true; but, this alone is not sufficient to invalidate an existing zoning ordinance. *First National Bank of Lake Forrest v. County of Lake*, 7 Ill.2d 213, 130 N.E.2d 267; *Sinclair Refining Co. v. Village of Wilmette*, 132 Ill.App.2d 601, 270 N.E.2d 587.

■■ Any resulting "loss" must be viewed in light of the current value of the property in addition to any pecuniary benefit, either direct or indirect, generated by the advertising on the property. It was the uncontroverted testimony of defendant's expert that the rental value of the signs on the subject property was approximately $3,600 annually and aggregated between $40,000-$45,000 from 1950 to 1972. We recognize that the expert did not consider taxes on the property nor the maintenance costs involved in upkeep. Nevertheless, the rental factor must be considered in mitigation of Zenith's "loss" due to the zoning classification. Moreover, the cogency of plaintiffs' argument in this regard is somewhat diminished by the fact that Zenith built the towers in the face of the then newly enacted ordinance. An analogous argument is found in *Goeller v. City of Chicago*, 103 Ill.App.2d 67, 75, 243 N.E.2d 444, wherein, "the degree of hardship is reduced where a purchaser buys [herein builds] subject to restriction * * *." (This is distinguished from the ability to attack an ordinance by a subsequent purchaser, *Trust Co. of Chicago v. City of Chicago*, 408 Ill. 91, 96 N.E.2d 499.)

Plaintiffs declare "clearly the destruction in value caused by the zoning restriction * * * does not promote the public health, safety, morals or general welfare." These remarks are unsupported by any specific showing that the Village's plan does not provide for the aforementioned public welfare. As stated in *Stemwedel v. Village of Kenilworth*, 14 Ill.2d 470, 474, 153 N.E.2d 79, "one who assails the constitutionality as applied to a particular property must prove by clear and affirmative evidence

that it constitutes arbitrary, discriminatory or unreasonable municipal action, and that it will not promote the safety and general welfare of the public." Conversely, defendant's argument that the owners of nearby homes have a right to rely on the continuance of the ordinance, although having substance, is weakened by the fact that no residents of the area were called to testify as to their objection to the proposed use. Nevertheless, as the court in *Sinclair Pipe Line v. Richton Park*, 19 Ill.2d 370, 378, 167 N.E.2d 406, stated:

> "[T]he court must decide whether the restriction has a basis in public health, safety and welfare, in light of the uses to which surrounding property is or may be put, the care with which the community has undertaken to plan its land use development, and the evidence or lack of evidence of community need for the use proposed by plaintiff."

The testimony of defendant's experts, as to the effect the proposed use would have on the immediate neighborhood, is compelling evidence of the Village's desire to uphold an ordinance beneficial to the public welfare. That the restriction of an area for residential use has a substantial relation to the public welfare needs little discussion, for by such a regulation the property owners are protected from uses which reduce values, create hazards, cause undue vehicle traffic, noises and the like. (*Miller Brothers Lumber Co. v. City of Chicago*, 414 Ill. 162, 111 N.E.2d 149.) We find no showing made by plaintiffs that the Mt. Prospect ordinance is so unrelated to the public good that we would be justified in overturning the zoning ordinance as applied to the subject property.

The gain to the public, resulting from a restriction for residential use, is further illustrated by our court's finding in *Citizens Bank and Trust Co. v. City of Park Ridge*, 5 Ill.App.3d 77, 83, 282 N.E.2d 751, the need for regulation is great arising from the constantly increasing density of our urban population and the growing complexity of our civilization.

■■ Plaintiffs correctly assert that where the gain to the public is small as compared to the hardship imposed upon the owner no valid basis for the exercise of the police power exists. (*Marquette National Bank v. County of Cook*, 24 Ill.2d 497, 182 N.E.2d 147.) However, the cases hold that it is not the owner's loss of value alone that is significant, but also the fact that the public welfare does not require the restrictions and the resulting loss. The rule does not relieve the plaintiff of proving that the zoning classification in question constituted an arbitrary, discriminatory or unreasonable municipal action. (*Whittingham v. Village of Downers Grove*, 101 Ill.App.2d 166, 242 N.E.2d 460.) The record discloses that plaintiff has not done so.

Predicated upon their experts' testimony, plaintiffs also assert the sub-

ject site is not suitable for single-family residence development. King testified:

> "Although single-family residences could be built here as anywhere, it is my opinion that this is not a good place for single-family homes. My reasons are that the character of the property is so affected by the commercial * * *."

Lawrence testified:

> "It is physically possible to use the subject property for houses, but in my opinion, it is not a proper use."

Defendant's experts testified to the contrary. The subject property is situated in an existing, established residential neighborhood used solely as such, since the area was zoned in 1944 and, as previously discussed, the fact that the property is located at an intersection is not determinative of its unsuitability for single-family residence developments. *Cosmopolitan National Bank of Chicago, supra.*

Plaintiffs also argue that growth in the area has been heavy since 1950, most of the commercial uses developing subsequent to that time and, "during all this time, no residential development took place on the subject property." Initially, it appears that the development of the area, both residential and commercial, followed the zoning ordinance of the Village and the disparity in time is only reflective of the natural inclination of business to follow developing residential patterns. Secondly, the fact that no residential development has taken place on the subject property is due to plaintiffs' failure to so provide. Moreover, the plaintiffs' argument that the "trend of development" is toward commercial, is undisputed. However, we note that the commercial development, consistent with the comprehensive plan of the Village, took place in areas zoned for commercial development.

■■ In the instant case we conclude that the trial court was correct in holding that plaintiffs failed to overcome the presumptive validity of the defendant's zoning ordinance, and we find the judgment was not against the manifest weight of the evidence. The best that can be said of plaintiffs' position is that a legitimate dispute may exist as to the desirability of the zoning classification presently imposed upon plaintiffs' property. Under such circumstances the legislative judgment must prevail. *Standard State Bank v. Village of Oak Lawn,* 29 Ill.2d 465, 194 N.E.2d 201; *Duryea v. City of Rolling Meadows,* 119 Ill.App.2d 445, 256 N.E.2d 32.

Accordingly, the judgment is affirmed.

Judgment affirmed.

DRUCKER, P. J., and LORENZ, J., concur.